427 So.2d 1248 (1983)
STATE of Louisiana, State-Appellee,
v.
James J. "Sonny" RAMBIN, Jr., Defendant-Appellant.
No. 15156-KA.
Court of Appeal of Louisiana, Second Circuit.
February 22, 1983.
Writ Denied April 15, 1983.
*1249 Whitehead & McCoy by Charles R. Whitehead, Jr., Natchitoches, for defendant-appellant.
William R. Jones, Dist. Atty., Coushatta, for state-appellee.
Before PRICE, HALL and SEXTON, JJ.
SEXTON, Judge.
Petitioner-appellant, an insanity acquittee and an inmate at the Feliciana Forensic Facility of the East Louisiana State Mental Hospital in Jackson, Louisiana, brings the instant appeal to challenge the trial court's refusal to discharge him and/or release him on probation from the Forensic Facility. The trial court held that the petitioner was not entitled to a discharge or probationary release, finding that he had not satisfied his burden of proving that he would not be dangerous to himself or others upon release. We affirm.
Petitioner in this cause is James J. "Sonny" Rambin, Jr., a 56 year old white male. Mr. Rambin, who is from Red River Parish, is married, and his marriage has produced one son  now deceased.
On May 2, 1972, Mr. Rambin was indicted by the Red River Parish Grand Jury for the murder of Willie Green on April 24th of that year. At arraignment Mr. Rambin entered a plea of not guilty and not guilty by reason of insanity. At the time the case came on for trial, and subsequent to stipulations between the District Attorney and counsel for defendant, the trial court rendered a verdict of not guilty by reason of insanity, and on June 25, 1973, ordered the defendant committed to East Louisiana State Mental Hospital at Jackson, Louisiana for treatment.
On March 31, 1977, Mr. Rambin was released on probation from the state facility at Jackson for an indefinite period. In granting probation, the trial court attached three specific conditions to Mr. Rambin's probationary release, requiring that: (1) Mr. Rambin make bi-monthly visits to the local Mental Health Clinic and (2) abstain from the use of alcoholic beverages and (3) that a probation officer file a monthly report with the judge concerning Mr. Rambin's progress. Mr. Rambin's probation was also made subject to ten general and statutorily delineated conditions.[1]
This probation was revoked on August 20, 1979. The trial court found that Mr. Rambin had violated specific and general conditions of his probation by consuming alcoholic beverages and by possessing a single barrel shotgun on July 21, 1979. It was established at the August 20 revocation hearing that on July 21, Mr. Rambin had negligently *1250 driven his pickup into another vehicle while in an intoxicated state and had momentarily driven away from the scene of the crime. Mr. Rambin, while extremely inebriated, was arrested by police officers and charged with operating a motor vehicle while intoxicated, hit and run driving, failure to report an accident, felony possession of firearms, and operating a motor vehicle without glasses. Subsequent to revoking Mr. Rambin's probation upon the strength of these findings, the district court directed that Mr. Rambin be recommitted to the Feliciana Forensic Facility at Jackson by an order dated September 21, 1979.
On June 4, 1982, Mr. Rambin filed an application seeking discharge and/or release on probation from the Feliciana Forensic Facility at Jackson, to which he had been recommitted by the order of September 21, 1979. Pursuant to this application for discharge, a hearing was held on August 3, 1982, to determine whether Mr. Rambin could be legally released. Extensive psychiatric testimony was adduced at the hearing, and upon assessing the evidence presented, the trial judge decreed that Mr. Rambin could not at that time be released from Jackson. The decree was based upon the finding that Mr. Rambin had not proven that his release would not endanger himself or others. Mr. Rambin's appeal of this decree constitutes the subject matter of the instant appeal.
LSA-C.Cr.P. Arts. 650-658 govern the commitment and release of defendants acquitted on grounds of insanity. Mr. Rambin was originally committed to Jackson pursuant to LSA-C.Cr.P. Art. 654, which provides that a defendant acquitted of capital crimes on grounds of insanity must be committed to a mental institution. LSA-C. Cr.P. Art. 655 provides that a criminal defendant committed pursuant to Article 654 may apply to the court for an unconditional discharge or a probationary release. Article 655 provides further that upon the submission of such an application, "the superintendent of the mental institution where the person was committed [shall] make a report and recommendation ... as to whether the person can be discharged or can be released on probation, without danger to others or to himself." Under LSA-C.Cr.P. Art. 656, the court may authorize an independent psychiatric examination of the applicant and obtain the results thereof in order to complement and verify the report submitted by the mental institution's superintendent pursuant to Article 655.
LSA-C.Cr.P. Art. 657 states that, after considering the reports submitted under Articles 655 and 656, the court may either continue commitment or conduct a contradictory hearing to ascertain the applicant's behaviorial propensities and psychological tendencies. If the court orders such a hearing, Article 657 stipulates that it be governed by a single standard  the acquittee may be unconditionally discharged or released on probation if this emancipation may be effectuated without danger to others or to himself. It is important to note that the criterion for release is not, strictly speaking, mental lucidity, but rather the social threat and danger that would be engendered by liberating the insanity acquittee from an institutionalized setting. See Comment (b), LSA-C.Cr.P. Art. 657.
The burden of proof, in a hearing held to determine whether an insanity acquittee may be freed without danger to himself or others, is on the acquittee himself. We conclude that the trial court did not err in finding that Mr. Rambin failed to prove his release would not endanger himself or others. There are several critical factors which, when cumulatively considered, compel this conclusion.
The psychiatrists testifying at Mr. Rambin's trial established the existence and complexity of Mr. Rambin's underlying pathology. Dr. Lawrence L'Herisson, an assistant professor of psychiatry at LSU Medical School in Shreveport, testified that in the past Mr. Rambin had had a psychiatric disorder characterized by "a psychotic state" and that "alcohol may very well be a major part of his psychosis." Dr. Norman Mauroner, an associate professor of psychiatry at LSU Medical School in Shreveport, testified that Mr. Rambin had "had considerable *1251 problems over a period of years, in that he would take off for several days at a time and his behavior would be described as somewhat bizzare. He also would enter into bouts of drinking and strangely enough this occurred roughly twice a year, and was sort of a repetitive situation." As Dr. Mauroner stated in a written report, received into evidence, Mr. Rambin had a "long history of bizarre behavior, brief periods of psychosis, episodic excessive drinking, paranoid jealousy and paranoid ideation." Dr. Mauroner noted in the same report that Mr. Rambin had been initially diagnosed, upon his admission into Jackson, as a "schizoid personality with episodes of paranoid psychosis" and "alcohol abuse."
Dr. Augusto Abad, a staff psychiatrist at Jackson's Forensic Facility, testified that "I have no doubt in my mind that [Mr. Rambin] is an alcoholic. He has been drinking since he was seventeen or so .... He had been in court or in jail a few times, all related or mostly related to alcohol use." Dr. Theresita Jiminez, another staff psychiatrist at Jackson, testified that she found, upon examining Mr. Rambin, that he was "very paranoid" and suffered from "paranoidic schizophrenia."
The principal drug with which Mr. Rambin was being treated for his psychiatric disorder was Haldol. Under the therapy regimen instituted at Jackson, Mr. Rambin was administered twenty miligrams of this medication a day.
While all four examining physicians acknowledged the existence of Mr. Rambin's underlying pathology and psychological abnormality, they nevertheless recommended his release with unanimity. The doctors asserted, in essence, that Mr. Rambin's psychiatric disorders had been deactivated into a state of "chemical remission" by Mr. Rambin's prescribed medication, Haldol. These recommendations constitute the core of Mr. Rambin's appellate contentions that the trial court erred in failing to order his discharge from Jackson.
Although these professional recommendations lend substance to petitioner's contentions, we are compelled  by a series of interrelated factors and considerations  to conclude that the trial court's independent determination as to release was a legally sound one. We note, in the first instance, that all of the testifying doctors acknowledged that Mr. Rambin's underlying pathology was still existent and had not been effectively extirpated despite intensive therapy. Dr. L'Herisson made the following observation on cross-examination:
Q. That psychotic state, when you say in remission, does that mean it does not exist at all, or it's just under control at this time?
A. It is at least chemically controlled.
Dr. Mauroner observed that "the underlying pathology is still there." Dr. Abad stated that Mr. Rambin was an alcoholic and that "we don't use the word `cure' in the field of alcohol. Because, you know, once you are an alcoholic ... you are always an alcoholic, you cannot go about the drink, and so we don't use the word `cure'." Dr. Jiminez, similarly, made the following concession on cross-examination:
Q. Do you think that Mr. Rambin still suffers from paranoid schizophrenia?
A. The symptomatology of the psychosis is now in remission.
Q. Which don't (sic) mean he is cured, it is just held up ... the evidence of it is still there?
A. Yes, sir.
As Dr. Mauroner concluded, "he still has some of the underlying traits, ... I don't think that they will ever disappear." The substance of the doctors' testimony, in sum, was that although Mr. Rambin's psychosis was chemically controlled, it in no wise had been effaced by drugs, and in fact was still present.
In addition to the medical recognition that Mr. Rambin's psychiatric disorder was still present, the testifying physicians illumined another major risk that would be associated with Mr. Rambin's release. It was the consensus of the psychiatric experts that if Mr. Rambin, upon release, either discontinued taking Haldol or began drinking, his aberrational behavior patterns and *1252 destructive tendencies could resurface with potentially tragic results. Dr. L'Herisson noted, in a written report filed into evidence, that "it would take very little to trigger an alcoholic binge" and that "If the patient should discontinue his medication or should get back on alcohol then problems could very well develope (sic)." Dr. Mauroner noted, in his written report, that "There is strong evidence that the likelihood of an exacerbation (psychosis returning) is great, if he stops taking his Haldol or if he takes less than a therapeutic level." Dr. Mauroner testified that if Mr. Rambin discontinued taking his medication that "there is the possibility of decompensating, losing control, a return of paranoid ideation." Dr. Jiminez related this perception on cross-examination:
Q. Do you feel like his psychosis would return if he was not given [Haldol]?
A. Yes, sir, that's a possibility. It's possible for him to get psychotic again.
Thus the doctors unequivocally acknowledged that Mr. Rambin could suffer a psychological and emotional relapse if he were to either drink or abstain from his prescribed medication. The possibility of such a relapse is enlarged and augmented by Mr. Rambin's medical history. Mr. Rambin was extremely inebriated when in 1979 he negligently struck another vehicle, while in his pickup, and had his probation revoked. On another occasion, when Mr. Rambin was released from Jackson for the funeral of his father, he attempted to purchase alcoholic beverages. In addition to Mr. Rambin's drinking in violation of probationary conditions, his reluctance to take Haldol as prescribed significantly increases the possibility of the psychological relapse adverted to by the testifying physicians.
Dr. Jiminez testified that when first committed, Mr. Rambin "was really always wanting to be taken off medication." Dr. Mauroner noted in his written recommendations that "a review of the clinical data, both inpatient and outpatient, reveals some resistance on his part to the taking of his Haldol regularly." Dr. Mauroner noted further, on cross-examination, "that there has been a reluctance on his part to take medication." Thus, the possibility that Mr. Rambin's anti-social propensities could be reactivated by either his imbibition, or his failure to self-administer Haldol, is significantly augmented by Mr. Rambin's own history of drinking and resisting medication.
Another factor in our determination that Mr. Rambin failed to prove that he would not be dangerous upon release, is the fact that the testifying physicians prescribed a multi-partite therapeutic regimen. The psychiatric experts postulated several elements of therapy which they believed would be necessary  or at least advisable  in obviating Mr. Rambin's malignant propensities: the self-administration of Haldol; complete abstinence from alcohol; participation in Alcoholics Anonymous; outpatient treatment at a mental health clinic; and blood and urine monitoring at a substance abuse clinic. The trial court believed that so many components of therapy were needed to ensure the non-recurrence of pathological tendencies, that non-compliance was a strong possibility and Mr. Rambin's pacification could not be effectively guaranteed. The trial court was especially sensitive, in this determination, to Mr. Rambin's demonstrated inclinations to drink, resist medication, and violate probationary conditions.
Perhaps the most crucial factor in our analysis concerns the seriousness of the crime committed by Mr. Rambin. Implicit in the verdict of "not guilty by reason of insanity"  rendered in the State's case against Mr. Rambin in 1973  is the judicial finding that, although Mr. Rambin was insane at the time of the act, he did in fact kill Willie Green. Assuming the validity of this finding and that Mr. Rambin did in fact take the life of Willie Green, Mr. Rambin violated the most fundamental prohibition of natural and positive law. More importantly, for our purposes, the fact that Mr. Rambin committed such an act bespeaks an insidious proclivity deeply and inextricably rooted in his now outwardly benign psyches. Mr. Rambin has manifested the capacity to perpetrate the most vicious *1253 of human acts, and this fact necessarily plays a predominant role in the dangerousness analysis which is dispositive in granting or denying release.
We note that as the legislature has expressly ordained, the burden of proof in this context in not upon the State to prove the existence of Mr. Rambin's hostile proclivities; the burden, rather, is upon the applicant to demonstrate that he would not pose a danger to himself or others upon release. In applying this evidentiary burden of proof to the facts of this case, it is apparent that the ruling of the trial court was correct.
We note moreover, that the trial court was not remiss in making an independent evaluation of the applicant's dangerousness and the merit of his application for release, notwithstanding the contrary recommendations of the psychiatric staff. The determination of whether an insanity acquittee poses a danger to himself or others is not, in the context of evaluating an acquittee's application for manumission, a strictly psychiatric one. The conclusion called for by the law in this instance is not medical, but a legal one. It involves not merely psychiatric findings, but rather the application of legal standards to those findings, the interpretation according to principles of law of those findings. If this were not the case, doctors  and not district judges  would have the legal authority to render discharge decrees.
The result reached herein is buttressed by the Supreme Court's analysis in State v. Thompson, 387 So.2d 1114 (La.1980). In that case, the Supreme Court affirmed the trial court's denial of release where  although the testifying psychiatric experts recommended release  the applicant had in the past violated his probation, he depended upon very close supervision to keep him from posing a threat to others, and the expert witnesses opined that if he discontinued his medication the violent recurrence of a psychotic condition was a strong likelihood.
We acknowledge that a different result was reached in State v. Collins, 381 So.2d 449 (La.1980). In Collins, the applicant's psychotic condition was placed in remission by the administration of therapeutic drugs. The trial court denied release in contravention of the unanimous psychiatric recommendation that the applicant did not pose an unreasonable danger and should therefore be discharged. As Chief Justice Dixon astutely noted therein, to discount an applicant's "synthetic sanity" would constitute a post facto attempt to "erase improvement produced by medical science." Id. at 450. However, we are constrained by salient factual distinctions between Collins and the instant case to reach a different result herein. In Collins the applicant had been charged with attempted armed robbery, while in the instant case we are dealing with the more grievous offense of murder. The cases are further distinguished by the demonstrated propensity of our applicant to drink, resist medication, and violate probation. Furthermore in Collins the evidence that the defendant, if medication were discontinued, would suffer a relapse was said to be "tenative." In other words, we find our case to more nearly resemble Thompson than Collins.
We emphasize the extreme importance, in analyzing applications for discharge under LSA-C.Cr.P. Arts. 650-658, of deciding each case on its particular facts. We therefore do not presume to pronounce a holding which exceeds our facts. To do so would either unfairly prejudice the future applications of insanity acquittees or needlessly constrain the trial court's discretionary prerogatives.
In light of the seriousness of Mr. Rambin's crime, his resistence to medication and propensity for imbibition, his past probationary violations, the significant possibility of Mr. Rambin's non-compliance with a prescribed therapeutic regime, the substantial likelihood that such a non-compliance would result in the recurrence of a psychological disorder, and the psychiatric finding that Mr. Rambin's underlying pathology still exists, we hold that the trial court did not err in finding that Mr. Rambin failed to prove that he would not pose a danger to himself or others upon release. We affirm the trial *1254 court's denial, under LSA-C.Cr.P. Art. 657, of Mr. Rambin's application for discharge or probationary release. The judgment of the trial court is therefore affirmed.
AFFIRMED.
NOTES
[1] As State Probation and Parole Agent Patrick Chamberlain testified at a probationary revocation hearing, Mr. Rambin's probationary stipulations required that he:

"Number 1, refrain from criminal conduct, specifically the violation of any state, federal, local or municipal law. Two, support your legal dependents to the best of your ability. Three, report to your probation officer as directed. Four, permit the probation officer to visit you at your home or elsewhere. Five, devote yourself to an occupation approved by your probation officer. Six, refrain from owning or possessing firearms or other dangerous weapons. Seven, make restitution, which was not imposed. Number eight, refrain from frequenting unlawful or disreputable places or consorting with disreputable persons. Nine, remain within the jurisdiction of the Court, and get the permission of the probation officer before any change in address or employment. Ten, make a full and truthful written report at the end of each month to your probation officer."
Mr. Chamberlain's recitation of the general probationary conditions imposed upon Mr. Rambin constitutes an approximate paraphrase of the inclusive list of legally appropriate probationary conditions suggested by LSA-C.Cr.P. Art. 895. These general conditions, which the exception of the first, are discretionary rather than mandatory, their invocation depending upon the judgment of the sentencing court.