628 So.2d 241 (1993)
STATE of Louisiana
v.
Ricky PEREZ.
No. 93-KA-301.
Court of Appeal of Louisiana, Fifth Circuit.
December 15, 1993.
Clay J. Calhoun, Jr., Clinton, for appellant Ricky Perez.
John M. Mamoulides, Dist. Atty., Dorothy A. Pendergast, Asst. Dist. Atty., Research & Appeals 24th Judicial Dist., Gretna, for appellee State of La.
*242 Before GAUDIN, GOTHARD and CANNELLA, JJ.
CANNELLA, Judge.
Defendant, Ricky Perez, appeals from a judgment, denying his application for discharge on probation from the state mental facility where he has been confined since being found not guilty by reason of insanity of second degree murder. For the reasons which follow, we affirm.
Defendant was indicted on October 6, 1978 for the first degree murder of his father. The indictment was amended to reduce the offense to second degree murder. On January 29, 1979, following a bench trial, defendant was found not guilty by reason of insanity. After a finding that defendant was dangerous to himself or others as required by La.C.Cr.P. art. 654, he was committed to the state mental hospital, Feliciana Forensic Facility (the facility), at Jackson, Louisiana.
In December, 1981, after a hearing pursuant to La.C.Cr.P. art. 655(B) on defendant's motion to be released from custody, the trial court refused to discharge defendant, but granted the facility permission to begin a program of gradual deinstitutionalization of defendant. Consequently, defendant was granted pass privileges and allowed to leave the hospital for home visits.
A sanity hearing was conducted on October 25, 1984. The trial court ordered that pass privileges be extended and left to the discretion of the treating physician, but limited to weekends only. On May 31, 1984 the pass privileges were revoked, although why is not altogether clear.[1] A few months later, on September 12, 1985, after another hearing on a motion for discharge, the trial court ordered that defendant not be released on probation. That decision was affirmed on appeal. State v. Perez, 487 So.2d 671 (La. App. 5th Cir.1986), writs denied, 489 So.2d 245 (La.1986).
Pass privileges were reinstated after a hearing on August 14, 1986. The trial court granted defendant one weekend pass per month under the guidance of the facility. On July 2, 1987, the trial court extended the pass privileges to ten days per month. The conditions of the pass privileges were that defendant reside with his mother and have a urinalysis during each ten day pass period.
Thereafter, the superintendent of the facility recommended that defendant be discharged and a review panel was convened pursuant to La.C.Cr.P. art. 655. On August 31, 1988, the panel issued its report, recommending that defendant be conditionally discharged.[2] After a hearing on September 29, 1988, the trial court again denied defendant's application for discharge on probation and ordered that its previous order of July 2, 1987 remain in effect. The trial court found that defendant had not met his burden of proving that he was not mentally ill or a danger to himself or others. This court affirmed. State v. Perez, 548 So.2d 6 (La.App. 5th Cir.1989). The Supreme Court granted certiorari to review the court of appeal decision. State v. Perez, 550 So.2d 620 (La.1989). In a four to three decision, the Supreme Court affirmed the judgment of the court of appeal, holding:
[W]e are unable to say that the trial court abused its discretion in finding that defendant did not prove that he could be *243 released without danger to others or to himself under La.C.Cr.P. art 657.
State v. Perez, 563 So.2d 841 (La.1990).
Subsequently, the United State Supreme Court, in Foucha v. Louisiana, ___ U.S. ___, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), struck down a portion of Louisiana law for the continued confinement of an insanity acquittee, which placed the burden of proof on defendant and required only a finding of dangerousness, whether or not defendant was still mentally ill. The state Supreme Court, in State v. Boudreaux, 605 So.2d 608 (La.1992), recognizing the Foucha decision and its effect on our procedures for continued confinement of an insanity acquittee, held that:
An insanity acquittee confined by the state is entitled to release when he has recovered his sanity or is no longer dangerous, i.e., he may be held as long as he is both mentally ill and dangerous but no longer. Moreover, even if his continued confinement is constitutionally possible, the state may continue confinement only if it shows by clear and convincing evidence that he is mentally ill and dangerous. Foucha v. Louisiana, ___ U.S. ___, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992).
Defendant again filed in district court an application for his discharge on probation. The superintendent of the facility recommended his release and referred his case to a review panel for consideration. On August 28, 1992, the panel issued a report recommending that defendant be released on probation subject to the following conditions, that he
1. Continue taking medication as prescribed.
2. Submit to random or regular drug screens.
3. Attend the Mental Health Center or approved private psychiatric treatment.
4. Avoid contact with those who abuse drugs.
5. Live with his mother and/or responsible relatives.
On October 14, 1992, a hearing was held, and the trial court denied defendant's application for discharge, stating:
The court finds that the District Attorney has carried its burden by clear and convincing evidence that the defendant is mentally ill. There's no question about that. The doctors testified to that, that he is mentally ill. With reference to the danger, the court finds that he is dangerous. The drugs and medication is merely a mask, that he has this mental illness and it merely masks the illness.
On defendant's application, writs were granted and the case is now before this court for consideration.
Defendant argues in his brief that the trial court erred in finding that the state proved by clear and convincing evidence that he was still mentally ill within the meaning of La. R.S. 28:2(14) and that he was still dangerous within the meaning of La.R.S. 28:2(4).
Under Foucha, supra, and Boudreaux, supra, the burden of proof is on the state to prove both that defendant is mentally ill and dangerous. Under La.R.S. 28:2(14) a mentally ill person is defined as "any person with a psychiatric disorder which has substantial adverse effects on his ability to function and who requires care and treatment." La.R.S. 28:2(3) defines a person who is dangerous to others as "a person whose behavior or significant threats support a reasonable expectation that there is a substantial risk that he will inflict physical harm upon another person in the near future." And La.R.S. 28:2(4) defines a person who is dangerous to himself as "a person whose behavior, significant threats or inaction supports a reasonable expectation that there is a substantial risk that he will inflict physical or severe emotional harm upon his own person."
At the hearing, the testimony revealed that defendant has been diagnosed as schizophrenic, a "chronic paranoid type." Dr. Ritter explained:
Schizophrenia is one of the most common major mental disorders. Basically what the disease does is the individual substitutes fantasy for reality. Their daydreams become real to them, and all the emotional life is taken out of reality and invested in their daydreams. They become delusional; in other words, they develop *244 all sorts of false ideas and beliefs, sometimes grandiose.
He further stated that defendant's mental disorder has been controlled for the past one and one-half years by the use of three drugs, Prolixin, Lithium and Cogentin. Prolixin, a tranquilizer, is administered by injection every two weeks. He receives the injections at the facility or at West Jefferson Mental Health Center when he is on a pass. Lithium, taken orally three times a day, controls manic or hyperactive behavior. Cogentin reduces the side effects from the other two drugs. Lithium remains in the body for about one month and Prolixin for about six weeks, should defendant stop taking the drugs. Dr. Ritter further testified that defendant's mental disorder is stable and fully controlled by the drugs and that, if defendant remained unmedicated, there was a 75% chance that the symptoms of the mental disorder would return within three to six months. If the symptoms did recur, they would likely be hallucinations, since the thought processes of a person suffering from schizophrenia are fractured. Defendant is tested regularly to determine if he is taking his medications. He further stated that in the last few years, defendant has been spending about 50% of his time outside of the facility, on pass, and has not caused any trouble. A urinalysis is conducted both on his return to the facility and occasionally while on pass. Defendant has always tested negative.
Dr. Ritter testified about an occasion when defendant returned from his pass early because he sensed that something was wrong with his medication. In fact, his Lithium level had dropped. The doctor noted that defendant has never objected to the medication and understands his need for it. He also understands that he can never use alcohol or drugs again and that he must continue with outpatient treatment if released on probation. Finally, Dr. Ritter testified that defendant has shown no proclivity to violence since his admission to the facility in 1979 and that he presents no immediate danger to others or himself as a result of his mental illness.
Defendant was then called by the state and testified over defense counsel's objection. He stated that when the doctor took him off Prolixin, he became "kind of sick a little" so he informed the doctor that he needed Prolixin. On another occasion his Lithium level dropped while on pass and he became "kind of sick". He then returned to the facility early and the doctors "fixed" his medicine. The defendant stated that when his Lithium level elevates, he becomes toxic and when it drops, he becomes "manicy." Defendant further testified that the dropping of his Lithium level occurred before he was placed on his current formula of medication and that "everything is just going real smooth right now."
Dr. Charles Vosburg, chief psychologist at the facility, testified that there was one instance, on March 21, 1989, when defendant returned early from his pass. Defendant correctly surmised that his Lithium level had dropped below therapeutic levels. Afterwards the review panel considered defendant's response to that incident and it weighed favorably in support of a recommendation for release. Dr. Vosburg noted that defendant's psychiatric disorder did not adversely affect his cognitive and behavioral functions considering the medication he was being administered, the length of time that he had been in remission and his behavior in the facility and on pass. He also stated that, based on the panel's most recent assessment and interview, defendant was sane and understood the nature of his conduct.
On cross-examination Dr. Vosburg testified that, in the absence of appropriate levels of medication, defendant would still have a chemical imbalance which would cause mental disease and that, without medication, "something" might happen within time limits to his cognitive and behavioral functions. He noted that defendant requires a check of his Lithium level on a regular basis in order to adjust it to changes in his body chemistry or the environment. He stated on recross that "I would certainly think it would be reasonable to assume that, left unmedicated he (defendant) may begin to deteriorate as far as his mental illness. But, I cannot assume that automatically or because of the one incident *245 that he would naturally deteriorate into aggressive acts if he was left unmedicated. I can't make that premise jump."
Bill Caldwell, the social services counselor at the facility who managed defendant's case, testified that he has never seen the defendant attack or threaten another patient or staff member at the facility and stated that defendant was considered a minimum security risk. He noted that defendant, who previously had a substance abuse problem, now has a strong aversion to drugs and alcohol "because it resulted in his father's death and he wouldn't be at Forensic if it wasn't for drugs and alcohol." He further stated that defendant understands the signs of decompensation associated with his psychiatric disorder.
Barbara Johnson, a clinical social worker with the Office of Mental Health, testified that she tracks and monitors insanity acquittees which "entails making sure that they are participating in whatever the judges ... order them to do, whether it be attending the mental health centers, attending the drug abuse clinic, going to school, into a job training program, making sure that they are taking their medications, going to mental health centers, staying with their families, providing other kinds of social services or referring them to other agencies." She indicated that she stays in contact with the acquittees' families, mental health centers, probation officer and case manager[3] and that there is a policy at the mental health centers to notify her immediately if an acquittee misses an appointment, or if his Lithium level drops below therapeutic levels. She further stated, that if defendant was released on probation, she would be responsible for "keeping in touch with his progress."
Catherine Perez, defendant's mother, testified that she would monitor defendant's behavior and compliance with his medication regimen and would report to the court or mental health authorities any inappropriate behavior.
At the conclusion of the hearing, the trial judge found that the state had met its burden of proving, by clear and convincing evidence, that defendant was both mentally ill and dangerous and he denied the application for discharge or probationary release. After reviewing the record in its entirety we cannot say that the trial judge erred in his judgment.
Defendant was charged with and tried for the crime of murder. He was found not guilty by reason of insanity. It is implicit in that finding that defendant committed a homicide and did so because of mental illness. It is uncontradicted that defendant presently is still mentally ill. While it is true that most of the testimony indicates that the symptoms of defendant's mental illness are absent at this time, that absence is wholly contingent upon defendant's continuous use of medication. The testimony in the record indicates that defendant has made some progress, but there are still more liberal, alternative treatment plans available. Outpatient time could be increased and defendant's progress could be monitored further before complete discharge. When the past actions of defendant and the charged offense are as serious as homicide, the court must be especially cautious before releasing an insanity acquittee.
The trial court was faced with the same defendant, the same mental illness now currently under control by medication, the extremely severe past acts of defendant (homicide) and he concluded that defendant is both mentally ill and dangerous. The trial court heard the evidence, including the testimony of defendant, and concluded that the state had borne its burden of proof, by clear and convincing evidence. Under the circumstances we cannot say that the trial court erred or abused its discretion in denying defendant relief.
Accordingly, for the reasons stated above, the district court judgment, denying defendant's application for discharge, is affirmed.
AFFIRMED.
NOTES
[1] In an earlier court of appeal opinion, the court stated that "pass privileges were revoked at the request of Perez's treating physician due to the institution of Lithium treatments." State v. Perez, 487 So.2d 671, 672 (La.App. 5th Cir.1986), writs denied, 489 So.2d 245 (La.1986). However, the state has asserted that the court stopped the passes on its own after it discovered that defendant had tested positive in a drug and/or alcohol screening.
[2] The panel recommended the following conditions for defendant's discharge, that

1. He be placed on probation, the length to be determined by the court.
2. He attend the local mental health center for follow-up care.
3. He submit to routine random drug screens at the local mental health center.
4. He continue to take all medication as prescribed by the treating physician.
5. He be actively employed, seeking employment or attending a vocational rehabilitation program.
6. He abstain from intoxicating or mind-altering substances.
[3] She stated that a case manager monitors an acquittee's mental health treatment and his duties consist of making home visits, monitoring the taking of medication, making referrals to other services, and providing transportation.