648 So.2d 1319 (1995)
STATE of Louisiana
v.
Ricky PEREZ.
No. 94-K-0130.
Supreme Court of Louisiana.
January 27, 1995.
Clay J. Calhoun, Jr., Clinton, for defendant.
Richard P. Ieyoub, Atty. Gen., John M. Mamoulides, Dist. Atty., Terry Boudreaux, Gretna, for plaintiff.
PER CURIAM:[1]
Over the last ten years, the efforts of Ricky Perez to secure his conditional release on probation from the Feliciana Forensic Facility in Jackson, Louisiana, where he has been confined since 1979 following his insanity acquittal for the murder of his father, have been well documented in the jurisprudence of this state. See State v. Perez, 487 So.2d 671 (La.App. 5th Cir.1986), writ *1320 denied, 489 So.2d 245 (La.); 548 So.2d 6 (La.App. 5th Cir.1989), aff'd, 563 So.2d 841 (La.1990), cert. denied, ___ U.S. ___, 112 S.Ct. 2320, 119 L.Ed.2d 239 (1992); 628 So.2d 241 (La.App. 5th Cir.1993), writ granted, 94-0130 (La. 11/11/94); 644 So.2d 660. Since 1989, when this Court last revisited his case and narrowly affirmed the lower court's judgment denying his release on probation, the law of Louisiana has undergone fundamental change with regard to the confinement and release of insanity acquittees. To secure his release from confinement, an insanity acquittee no longer bears the burden of proving that he is not dangerous to himself or others, and the state may no longer continue his confinement on a finding of dangerousness without regard to the question of whether the mental illness which led to the insanity acquittal persists. Foucha v. Louisiana, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). The state may continue the confinement of an insanity acquittee "only if it shows by clear and convincing evidence that he is mentally ill and dangerous." State v. Boudreaux, 605 So.2d 608 (La.1992) (citing Foucha v. Louisiana); see La.C.Cr.P. art. 657 (as amended Acts 1993, No. 700, § 1).
The district court acknowledged and applied the Foucha standard after conducting relator's third and latest release hearing on October 14, 1992. The court found that the state had carried its burden of proving by clear and convincing evidence that relator was mentally ill, as the drugs and medication he was taking "merely mask[ed]" his underlying schizophrenic illness. The court also found that relator was dangerous because of the "75 percent chance that he would revert back to his prior condition [if he discontinued his medication], which we know that there was violence involved at that time." The court of appeal affirmed after finding that the district court did not "err[] or abuse[] its discretion in denying defendant relief." State v. Perez, 628 So.2d at 245. We disagree and reverse.
At the hearing conducted on October 14, 1992, Dr. Kenneth Ritter, a psychiatrist who has been treating relator at Jackson, and Dr. Charles Vosburg, the Chief of Psychology at the Feliciana Forensic Facility, both expressed the opinion that relator's schizophrenic illness has been in stable remission for some years and that he now presented no imminent danger to himself or others. The doctors based their opinions not only on their personal treatment of relator but also the history of relator's behavior in and out of the forensic facility over the course of fifteen years. As early as 1985, the doctors at the forensic facility had determined that relator's mental illness "would receive no further benefit by continued treatment at the hospital...," State v. Perez, 487 So.2d at 672, and nothing had occurred over the intervening seven years to change that prognosis. Dr. Ritter carefully emphasized that the treatment had included not only medication but also "therapy with the psychologists and social workers and other programs at Forensic." According to Dr. Vosburg, relator's stability stemmed not only from the medication he is taking but also from significant personal maturing which had occurred over the last fifteen years. Relator had entered the forensic facility when he was 19 or 20 and in 1992 he was 35 years old and not "the same individual as far as his maturity level, decision making ability, his judgment, his insight into his mental disorder, relationship with his family, relationship with the staff; all of these things," in Dr. Vosburg's opinion, "have evidenced a maturation process."
One sign of that stability and maturity came in 1989 when relator cut short one of his home furloughs and returned to the forensic facility because he felt himself beginning to decompensate. Relator reported to the hospital staff that something had gone wrong with the Lithium he was taking in combination with Navane, a psychotropic medication, to control his schizophrenic illness. A blood test confirmed that relator's Lithium had fallen below therapeutic level. The problem was solved by increasing the Lithium dose, and changing his other medication to Prolixin, a tranquilizer. Since then, relator informed the court at the October hearing, "everything is just going real smooth...." In fact, according to Dr. Ritter, relator's Prolixin dose, his major medication, had been halved over the course of two years and was low enough to eliminate *1321 side effects, one reason why the psychiatrist expressed confidence that relator would continue his drug therapy on an out-patient basis.
Dr. Ritter acknowledged that relator would probably decompensate if he discontinued his medication and lapse back into overt symptoms of his schizophrenic illness. "About 75 percent of the time," Dr. Ritter testified, "within six months the schizophrenia would begin to present itself again...." Nevertheless, Dr. Ritter also cautioned that "just because [relator] would miss one shot or two shots doesn't mean [his schizophrenia] would show up immediately." He also observed that a relapse into overt schizophrenic symptoms did not necessarily mean that relator would become violent or aggressive. The history of relator's treatment over fifteen years provided no instance of a violent incident with any one on the staff or any other patient in the forensic facility, or with anyone else outside the institution while relator was on furlough. From the first tentative steps in 1984 toward deinstitutionalizing relator by releasing him on weekend passes, State v. Perez, 487 So.2d at 672, relator had spent half of his time in the two years before the October, 1992, hearing outside the forensic facility. It was that history, as much as his personal contacts with relator, which led Dr. Ritter to state unequivocally that relator's "current status indicates he presents no imminent danger to others or self as a result of mental illness." Dr. Ritter could not predict with medical certainty the distant future if relator discontinued his medication for a significant period of time and relapsed into overt schizophrenic symptoms. Nevertheless, the psychiatrist summarized his findings as follows:
He certainly has shown no proclivity to violence since I've known him, even though at times he's been quite openly psychotic. Despite that, he showed no inclination to violence. Secondly, in the past 18 months, or thereabouts, he has been spending about 50 percent of his time outside the hospital on passes with his mother. There's been very little, if any, difficulty during the past 18 months. From what I can tell, as far as problems, he's had no problem with drugs, he's been cooperative in going to the mental health center here and having his urine tested and/or getting his medication. He presents no current management problems. He's in good remission and has been stable for a long time and certainly, in my opinion, presents ... [no] danger to himself or to other people.
Relator asks this Court only for conditional release on probation and not absolute discharge from the forensic facility. We therefore need not decide here whether an individual who functions in a stable manner, but who also requires medication and follow-up treatment to maintain that stability, falls within the present definition of a mentally ill person under Louisiana law. See La.R.S. 28:2(14) (a mentally ill person is "any person with a psychiatric disorder which has substantial adverse effects on his ability to function and who requires care and treatment.") Foucha v. Louisiana does not preclude this state from classifying so-called "synthetically" or "chemically" sane individuals as mentally ill persons because of their underlying psychological disorder and need for continuing care.
We assume that relator remains properly classified as a mentally ill person because of the substantial probability that the symptoms of his schizophrenic illness will return if he discontinues his medication. The inability of Drs. Ritter and Vosburg, or any other physician who has testified in the course of these extended proceedings, to give absolute assurances that relator will not become aggressive or violent if he relapses into overt schizophrenic symptoms does not, however, constitute clear and convincing evidence that relator is presently dangerous. For the third time in ten years, this Court has reviewed the record of relator's treatment inside and outside of the Feliciana Facility and found no evidence of any aggressive or violent behavior which might support "a reasonable expectation that there is a substantial risk that he will inflict physical harm upon another person in the near future," or a "reasonable expectation that there is a substantial risk that he will inflict physical or severe emotional harm upon his own person." La.R.S. 28:2(3) and (4). Relator has received the maximum therapeutic benefit he can achieve *1322 at the Feliciana Forensic Facility and has been at that point since 1985. His illness is completely controlled by his medication and, as illustrated by the 1989 incident, he apparently understands the need for, and has shown no reluctance in the taking of, his medication to maintain his mental stability. According to evidence presented at the October, 1992, hearing, his drug screens testing for illegal substances have all been negative since May of 1989, although relator has spent half of his time outside of the institution. Lastly, relator appears to have been a model patient inside and outside the institution walls for several years and enjoys the unswerving support of his mother, in whose home he has lived when released on his passes and where he will live if released on conditional probation.
It is clear from the testimony of Bill Caldwell, a social services counselor at the forensic facility, that relator was a far different person immediately before the killing of his father. His life was marked by substance and alcohol abuse, frequent barroom fist fights, and expulsion from school in the ninth grade because of his behavioral problems. One year before his father's murder he was committed to Southeast Louisiana State Hospital after he became agitated and suicidal; he was released with a diagnosis of paranoid schizophrenia exacerbated by substance abuse; and at the time of the murder he was receiving outpatient treatment at the West Jefferson Mental Health Clinic, the same clinic where he has received his treatments on furlough from the forensic facility.
The district court was fully aware of this history and understandably concerned that it revealed "an insidious proclivity deeply and inextricably rooted in his now outwardly benign psyche[]." State v. Rambin, 427 So.2d 1248, 1252 (La.App.2d Cir.), writ denied, 433 So.2d 153 (La.1983). Nevertheless, to judge a thirty-five-year old man who has received and responded to fifteen years of institutional treatment, including therapy as well as medication, by his conduct as an out-of-control teenager years earlier would be to ignore the potential of modern medicine to aid in the transformation of an individual. Even at a time when an insanity acquittee carried the burden of proof on the issue, we observed in State v. Collins, 381 So.2d 449, 451 (La.1980), that "[i]t would be meaningless to give a committed person an opportunity to prove that he is not dangerous if the trial court then had the absolute discretion to disregard that proof."
According to Barbara Johnson, the Mental Health Director for the Community Forensic Program, her office was prepared to act as a liaison between relator and his family and the West Jefferson Parish Mental Health Unit in the event the district court places relator on program. Johnson was prepared to coordinate and supplement the services of a social worker and case management worker at the mental health center to provide relator with monitoring on a weekly basis. The day before the October 14, 1992 hearing, she introduced herself to relator and his family and gave relator's mother a beeper that would allow 24-hour emergency access to her in the event of a problem. Johnson specifically recalled one instance in which she had intervened and arranged for the hospitalization of an insanity acquittee placed on probation after his family had reported to her that he had stopped taking his medicine and was beginning to decompensate. The entire process of obtaining a coroner's commitment and hospitalizing the probationer took only twenty-four hours. In Dr. Ritter's opinion, the coordinated efforts of a case manager supervisor and the community forensic services program "would enhance the likelihood that [relator] would stay out of trouble."
In 1989, when this Court last reviewed relator's case, we emphasized that "[w]hen the crime is a serious one like murder, a court should be especially cautious before releasing an insanity acquittee." State v. Perez, 563 So.2d at 845. We added, however, that if relator "stays on his medication, abstains from drug and alcohol abuse, and continues to do well on his ten-day passes, the trial court may conclude at some future date that he can be released on probation without danger to others or to himself in accordance with its program of gradual deinstitutionalization." Id., 563 So.2d at 846. Since then, the program of deinstitutionalization has proceeded on an uninterrupted course and relator *1323 has otherwise fulfilled the demands that this Court and the district court have placed upon him.
We therefore hold that the district court abused its discretion in denying relator release from confinement on probation. Accordingly, we vacate the district court's judgment and remand this case for the purpose of releasing relator on probation from the Feliciana Forensic Facility. The minimum conditions of that probation shall be the ones recommended by his doctors, namely, that relator continue taking medication as prescribed, submit to random or regular drug screens, attend a mental health center or approved private psychiatric treatment center, avoid contact with those persons who abuse drugs and live with his mother and/or other responsible relatives. Subject to review, the district court may impose other conditions related to the continuing care and treatment of relator on an out-patient basis.
REVERSED AND REMANDED.
NOTES
[1] Marcus, J., not on panel. Rule IV, Part 2, Sec. 3.