JACHARLES R. JONES, Judge.
Relator, Michael Watson, was committed to the Feliciana Forensic Facility because a jury found him not guilty by reason of insanity. He now seeks to invoke this Court’s supervisory jurisdiction based on the trial court’s refusal to release him despite the testimony from five expert witnesses who stated that Watson has no mental disease or defect. The expert also testified that Watson does not pose a danger to himself or others. Following a review of the record, we grant Relator’s wilt application and remand for further proceedings.

STATEMENT OF CASE

On December 13, 1990, in case no. 337-056, the Relator was found not guilty by reason of insanity for one count of attempted first-degree murder and one count of second-degree murder. In case number 337-057, the Relator was again found not guilty by reason of insanity on a simple kidnapping charge. The trial court then ordered the Relator to be committed *47 to the Feliciana Forensic Facility pursuant to La.C.Cr.P. art. 654 et seq.
On November 13,1997, a medical review panel presented the trial court with a recommendation that Watson be conditionally released to live with a sister |2in New Orleans. Following a review of the request, the panel concluded that Watson did not present a danger to others or himself. However, on May 7, 1998, after a contradictory hearing, the trial court refused to release Watson; no review of that decision was sought.
On April 18, 2000, the medical review panel presented the trial court with another recommendation that Watson be released, this time to a sister in Long Beach, Mississippi. A hearing was conducted over two days, June 13, 2000 and June 27, 2000. On the latter date, the trial court again refused to release Watson “due to the circumstances of the crime committed in this case.” Watson noted his intent to appeal the trial court’s ruling. Defense counsel subsequently filed a written notice of intent to seek writs, correctly noting that an appeal was not the appropriate procedure. Defense counsel was given a return date of October 6, 2000.[1]

FACTS

The underlying facts of this case are only sketchily mentioned in the hearing transcripts. The defendant apparently believed that the man who was living with his girlfriend’s mother was a threat to him and was going to “get” him. For some inexplicable reason Watson, while in a car with his girlfriend and her teen-aged brother, shot and killed the brother. He also went to the mother’s home and shot the man he believed was “out to get” him. The simple kidnapping charge arose from the defendant’s action of forcing his girlfriend to drive him to Texas, where she was either released or escaped.

\ .DISCUSSION

The sole issue in this writ application is whether the trial court committed manifest error when it refused to order Watson to be conditionally released from The Felicia-na Forensic Facility pursuant to La. C.Cr.P. art. 657.1, which provides in pertinent part:
A. At any time the court considers a recommendation from the hospital-based review panel that the person may be discharged or released on probation, it may place the insanity acquittee on conditional release if it finds the following:
(1) Based on the factors which the court shall consider pursuant to Article 657, he does not need inpatient hospitalization but needs outpatient treatment, supervision, and monitoring to prevent his condition from deteriorating to a degree that he would likely become dangerous to self and others.
(2) Appropriate outpatient treatment, supervision, and monitoring are reasonably available.
(3) There is significant reason to believe that the insanity acquittee, if conditionally released, would comply with the conditions specified.
(4) Conditional release will not present an undue risk of danger to others or self, as defined in R.S. 28:2(3) and (4).
B. The court shall subject a conditionally released insanity acquittee to such orders and conditions it deems will best meet the acquittee’s need for treatment, supervision, and monitoring and will best serve the interests of justice and society.
La. R.S. 28:2 provides in pertinent part:
(3) “Dangerous to others” means the condition of a person whose behavior or *48 significant threats support a reasonable expectation that there is a substantial risk that he will inflict physical harm upon another person in the near future.
14(4) “Dangerous to self’ means the condition of a person whose behavior, significant threats or inaction supports a reasonable expectation that there is a substantial risk that he will inflict physical or severe emotional harm upon his own person.
La.C.Cr.P. art. 657 provides for the discharge or release of an insanity acquittee, and states:
After considering the report or reports filed pursuant to Articles 655 and 656, the court may either continue the commitment or hold a contradictory hearing to determine whether the committed person is no longer mentally ill as defined by R.S. 28:2(14) and can be discharged, or can be released on probation, without danger to others or to himself as defined by R.S. 28:2(3) and (4). At the hearing the burden shall be upon the state to seek continuance of the confinement by proving by clear and convincing evidence that the committed person is currently both mentally ill and dangerous. After the hearing, and upon filing written findings of fact and conclusions of law, the court may order the committed person discharged, released on probation subject to specified conditions for a fixed or an indeterminate period, or recommitted to the state mental institution. A copy of the judgment and order containing the written findings of fact and conclusions of law shall be forwarded to the administrator of the forensic facility. Notice to the counsel for the committed person and the district attorney of the contradictory hearing shall be given at least thirty days prior to the hearing. [Emphasis added],
In Louisiana, the State is required to show by clear and convincing evidence that the insanity acquittee is both mentally ill and dangerous to himself and/or others if it wishes to have the confinement continued. La.C.Cr.P. art. 657; State v. Perez, 94-0130, p. 2 (La.1/27/95), 648 So.2d 1319, 1320; Foucha v. Louisiana, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). The standard of review is whether, considering all of the evidence, the tidal court abused its discretion in denying the relator a conditional release on probation. See Perez, 94-0130 at p. 7, 648 So.2d at 1323.
Foucha was the seminal ease in which the United States Supreme Court found that the State of Louisiana could not indefinitely institutionalize an insanity | sacquittee unless the State could show that the person was both mentally ill and dangerous. The court found that the State could not justify holding Foucha solely because of his “antisocial personality that sometimes leads to aggressive conduct”.
In the instant case, the Relator argues that he should be released because the five experts who testified in both of the commitment hearings all stated that he had no mental disease or defect and none testified that he is dangerous to himself or others. He further notes that the report prepared by the medical review panel in April 2000 reflects no current diagnosis of any mental illness, i.e. Axis 1 or Axis 2; the only diagnoses are hypertension and problems with incarceration and involuntary hospitalization. Notably, the report does not even reflect a diagnosis of antisocial personality disorder as was the ease in Fou-cha.
The Relator is correct in his assertion that no doctor testified that he currently suffers from a mental disease or condition. On June 13, 2000, Dr. Alan Newman, a forensic psychiatrist employed at Eastern Louisiana Mental Health System, Forensic Disease, or “ELHSFD” (formerly known as Feliciana Forensic Facility), testified that he has been Watson’s treating physician since July 1999. Dr. Newman stated that it was the opinion of *49 the review panel that Watson “does not currently have any kind of mental disorder” and believed that Watson should be conditionally released. Watson was being housed in the least restrictive environment available. He was rated a level four in behavior, which is the highest rating and is given to those patients with the fewest behavior problems (Id.). According to Dr. Newman, the last time Watson had a problem was in January 1999 when he became involved in a fight with another patient; the other patient instigated the conflict, and Watson responded in self-defense; there were no physical injuries to the patients. Watson had also been involved in a verbal | (¡argument with a nurse in November 1999, but no formal write-up resulted. According to Dr. Newman, Watson’s argument with the nurse was based upon a “personality conflict” and was not the result of any mental condition or delusion on the defendant’s part.
Dr. Newman further testified that it was the recommendation of the review panel that Watson be released to live with his sister in Long Beach, Mississippi. Dr. Newman stated that Watson would be supervised by the Mississippi Department of Probation and Parole, but that no recommendation for psychiatric treatment was being made because Watson had not been receiving any medication, although he was receiving counseling and therapy with a social worker. Dr. Newman indicated that there had not yet been plans made for Watson to receive counseling after release, but that he assumed arrangements would be made before actual release.
The trial court questioned Dr. Newman about what type of passes Watson had been receiving. Dr. Newman explained that Watson had been going on day passes with staff members and other patients, but had not yet had any overnight passes. During examination by defense counsel, Dr. Newman reiterated that it was the unanimous opinion of the review panel that Watson is no longer mentally ill and is not dangerous.
The second witness on June 13, 2000 was Dr. Charles Vosberg, a forensic psychologist employed at the Feliciana Facility since 1983. Dr. Vosberg testified that he was a member of the current review panel and had been a member of the previous panel, which recommended release in 1997. Dr. Vosberg testified that he agreed with Dr. Newman’s analysis of Watson’s situation and that Watson is neither mentally ill nor dangerous.
|7In response to questioning by defense counsel, Dr. Vosberg testified that the previous recommendation had been for Watson to be released to live with family in New Orleans. The current recommendation was to release him to another relative in Mississippi, a more rural location. In either case, according to Dr. Vosberg, Watson has a very supportive family, which he would describe as a “stellar, very high level, high functioning” family, which is capable of helping Watson adjust into society.
On redirect, the State questioned Dr. Vosberg about why Watson was not placed on weekend passes after the trial court rejected the 1997 recommendation for immediate release. Dr. Vosberg explained that he typically follows a course of gradual deinstitutionalization; however, in Watson’s case, given his family and his situation, it was “obvious” to the review panel that he could make an immediate move to release. Dr. Vosberg opined that the panel’s recommendations were based on the “absence of mental illness. [W]e saw no mental illness in this individual throughout the time period that we were familiar with him as a review panel ... [N]o major incidents to amount to anything as far as problems with staff or other patients.... We didn’t feel that it was necessary to go that route, you know.” The doctor further stated, “Certainly if the Court would choose for us to consider that we would absolutely or maybe we would consider some more restrictive transfer but we felt that given the current structure of the family it would be a good move to do.” *50 Additionally, Dr. Vosberg noted that Watson had availed himself of the individual and group therapy at the facility and had undergone a lot of counseling.
After Dr. Vosberg testified, the trial judge noted that he recalled another doctor testifying at his request at the previous hearings. The judge admitted that he had misgivings about releasing Watson before and continued to have those |smisgivings; therefore, he wished to listen to the other doctor who examined Watson at the last hearing. The trial judge specifically noted his concern over the incident between Watson and the nurse. He further noted that, no matter how supportive the family is, Watson would not be released immediately from an institution without a plan of supervision.
After the trial court voiced his concerns, Dr. Vosberg explained that there is another option which would be a “step down” and that would be placement in a group home such as the Harmony Group Home in Baton Rouge. The trial judge noted that such a step approach was something he might entertain, but he still wanted the other experts to examine Watson. The trial judge also stated, however, that “there’s no way I’ll cut him loose without a definitive plan if I cut him loose.”
At the continuation of the June 27, 2000 hearing, Dr. Richard Richoux[2] was stipulated to be an expert in forensic psychiatry. Dr. Richoux testified that he was on the original sanity commission; he also examined Watson that day along with Dr. Raphael Salcedo at the court’s request. Dr. Richoux testified that he also had examined Watson several times between 1989 and the hearing that day. In 1989, Dr. Richoux reached the conclusion that Watson was suffering from “a major depression with psychotic features which rendered him unable to distinguish right from wrong at the time of the original offenses.” After reviewing Watson’s records from the hospital and examining him, Dr. Richoux concluded that Watson had not exhibited any psychotic symptoms since the first time he examined him. As to the altercation between Watson and the nurse in 1999, Dr. Richoux indicated that there is no doubt that Watson has a temper; however, it was notable that the |9reports from the forensic facility all stated that Watson is not suffering from a mental disorder.
Dr. Richoux explained that major depression with psychotic features is a “condition which resolves itself during long periods of time unlike certain other mental conditions such as schizophrenia or bipolar disorder that are ongoing conditions that may be symptomatic to various degrees at various points in time but are always present.” In Dr. Richoux’s opinion, while major depression could certainly return in the future, “in between episodes it’s really a matter of semantics whether you say the individual’s suffering from the mental disorder or not.” Thus, Dr. Richoux concluded that Watson’s verbal altercation with the nurse was not a symptom of mental illness. Furthermore, based on what he had been told, Dr. Richoux also believed that the fight with the other patient was not a reflection of mental illness.
When questioned about Watson’s treatment, Dr. Richoux stated that he hated to use the term “warehoused” but that Watson was being “accommodated” in the facility. At one time Watson had been treated with Elavil, an anti-depressant, but he had not taken that medication for many years. As to the recommendations for Watson’s release, Dr. Richoux related that he had been informed that morning that the staff at the Harmony Transitional Living Center in Baton Rouge had interviewed Watson. Dr. Richoux stated that this facility is a group home, which is geared specifically to patients who had been involved with the legal system for a prolonged period of time and at which the residents would be monitored by the forensic aftercare program. Dr. Richoux stated that the only other setting which would possibly be less restrictive than the foren *51 sic facility, but more restrictive than a place such as the Harmony Center, would be a civil psychiatric hospital. |inHowever, Dr. Richoux did not believe that a civil hospital would accomplish anything in terms of better preparing the defendant for a move to a less restrictive setting.
On cross-examination by defense counsel, Dr. Richoux testified that Dr. Salcedo had also examined Watson, and that he agreed with Dr. Salcedo’s opinions — the State stipulated to Dr. Salcedo’s report. Dr. Richoux indicated that he would recommend a plan to release Watson to the Harmony House in Baton Rouge because he believed it would be an “ideal step” and preferable to immediately releasing him to his family. Dr. Richoux continued by stating that no matter how supportive the family, when someone had been institutionalized as long as Watson had (eleven years), monitoring by trained professionals is preferable.
During Dr. Richoux’s testimony, the trial judge again expressed concern about releasing Watson. Specifically, the trial judge questioned Dr. Richoux about the fact that Watson had no history of mental illness before the offense, then was medicated for only a short time, and apparently did not currently suffer from any mental illness. Dr. Richoux explained, as did Dr. Vosberg, that Watson’s lack of any mental illness at the present is consistent with the original diagnosis. In fact, Dr. Richoux testified that “the nature of this disorder is that it’s episodic and that’s true whether it’s treated or not” as compared with conditions such as bipolar disorder or schizophrenia which are continuing conditions. Dr. Richoux reiterated that Harmony House would be a proper setting where Watson could make the transition to society while being monitored. He further testified that he had a very positive impression of Harmony House in its handling of patients whom Dr. Richoux knew had been moved there from the forensic facility.
In After listening to Dr. Richoux’s testimony, the trial judge noted that there was a question in his mind as to whether Watson was misdiagnosed in the beginning, given the history of his treatment and the events of the offense. The defense counsel strenuously argued that all the experts agreed that Watson had been legally insane but now did not suffer from any mental illness, was merely being warehoused, and should be released into at least a transitional setting. The trial judge agreed that he could not “keep a sane man in jail (sic)” but that he believed it was the court’s and not the experts’ determination. The trial judge further noted that Watson had never been on an overnight pass, but the experts wanted to release him with virtually no supervision. After recommending the transitional setting, the trial judge stated that he would not release Watson.
Clearly, as Relator argues, the medical review panel and the court-appointed experts all agreed that Watson is neither mentally ill nor a danger to himself or others. To further support his argument that the trial court has abused its discretion, the Relator has provided the report of the medical review panel dated November 13, 1997, and transcript of the subsequent hearing on May 7, 1998. In the report, there are notations regarding incidents of “homicidal, assaultive, threatening, and/or destructive behavior.” The report notes the offense itself and a report from “CLSH” (Central Louisiana State Hospital) that Watson pushed another patient in 1995. The reference to CLSH indicates that Watson had at some point been transferred from the forensic facility at Feliciana to another state facility.
The three members of the medical review panel in 1997 were Dr. Harminder Malik, Dr. John Thompson, and Dr. Vos-berg, who was the only one who was on Lathe subsequent panel. At the May 7, 1998 hearing, Dr. Malik, Dr. Vosberg, Dr. Thompson and Dr. Ritter each testified.
Despite the trial court’s apparent willingness in 1998 to consider alternatives to Watson’s release to family in New Orleans, *52 the transcript from the June 2000 hearing reflects that the court will not release Watson from the forensic facility — even to the Harmony House transitional setting or to family in a rural area. The Relator is before this Court strenuously arguing that the trial court’s decision is totally unsupported by any expert testimony; every single doctor who has testified has stated that Watson has no mental illness. Furthermore, any indication of dangerous behavior, specifically arguments with patients or staff, were, in the opinion of Watson’s treating physicians, an indication that he has a temper and resulted from simple personality conflicts but were not a result of a mental condition. We agree.
Watson has presented a very clear and uncontroverted case indicating that he suffers from no mental illness, and has not suffered from a mental illness for some time. Under Foucha, La.C.Cr.P. art 657, and State v. Perez the burden then switched to the State to prove that he is in fact a danger. The State presented no evidence, let alone evidence which is clear and convincing, of the need to maintain Watson in residential state custody. Thus, the Relator is entitled to relief.

DECREE

Accordingly, we grant the Relator’s application for supervisory writ of review and remand this matter to the trial court with an order compelling the trial court to make a specific determination whether Watson should be released to a transitional facility in Baton Rouge, or to his relatives in Long Beach, Mississippi, |1Kas was recommended by the review panel and his treating physicians within 30 days of this order. These proceedings are stayed pending the State’s timely writ application to the Supreme Court.

WRIT APPLICATION GRANTED; REMANDED.

WALTZER, J., concurs in part and dissents in part.

. While it could be argued that this writ is not timely because the original return date was not within thirty days of the ruling, see Rule 4-3, Uniform Rules of the Courts of Appeal, if the appeal had been lodged this Court would have converted it to a writ. See State v. Everett, 505 So.2d 133 (La.App. 4 Cir.1987).

. Dr. Richoux’s name is incorrectly spelled in the transcript.