495 So.2d 366 (1986)
STATE of Louisiana, Respondent,
v.
Joseph M. BRELAND, Relator.
No. K85-790.
Court of Appeal of Louisiana, Third Circuit.
October 8, 1986.
Rehearing Denied October 29, 1986.
*367 R. James Kellogg, New Orleans, for relator.
Nathan Stansbury, Dist. Atty., Lafayette, for respondent.
Before DOMENGEAUX, GUIDRY and YELVERTON, JJ.
GUIDRY, Judge.
On June 29, 1979, relator was found not guilty of the crime of second degree murder by reason of insanity. On October 5, 1979, following a contradictory hearing held pursuant to La.C.Cr.P. art. 654, relator was committed to Feliciana Forensic Facility at Jackson, Louisiana (FFF), for custody, care and treatment. In July, 1980, relator initially sought to be discharged on probation, pursuant to La.C. Cr.P. art. 657, but without success. In early 1985, relator again filed an application for discharge or release on probation which was heard by the trial court on April 17, 1985. Following this hearing, the trial court again refused to discharge or release relator on probation and he filed the instant application for review of this ruling. On January 15, 1986, a panel of this court, including the writer, summarily denied his application for writ of review, following which relator made application to the Supreme Court for a writ of certiorari. On March 7, 1986, the Supreme Court granted relator's application for review and remanded the matter to this court for briefing, argument and opinion (Supreme Court of Louisiana, docket number 86-KK-0201).

FACTS
Joseph Breland was initially charged with the crime of first degree murder for the killing of his girlfriend. The State, prior to trial, reduced the charge to second degree murder. The homicide was brutal in that, in addition to killing his girlfriend by multiple stab wounds, Breland cut open the body cavity and removed the victim's uterus. All of the medical experts who testified at trial diagnosed Breland as a paranoid schizophrenic, with a possibility of attendant Multiple Sclerosis. At the conclusion of the trial, the jury found Breland not guilty by reason of insanity, following which, as aforestated, he was committed to FFF for custody, care and treatment. At the first release hearing held in July, 1980, Drs. Marilyn Skinner and Gene Usden, both specialists in psychiatry, and Dr. Curtis Vincent, Chief of Psychological Services at FFF, testified. At the hearing on April 17, 1985, the defendant presented his own testimony, as well as the testimony of his father, Glen Breland, C. Murray Henderson, Chief Executive Officer at FFF, and Dr. Jay C. Pennington, a specialist in psychiatry *368 and his treating physician. At this second hearing, the State presented no witnesses and no evidence other than the record of all prior proceedings. At the conclusion of this second hearing, the trial court issued its findings of fact and conclusions of law as required by La.C.Cr.P. art. 657, essentially holding that Breland failed to prove that he can be released on probation without danger to himself or others because he has the condition known as paranoid schizophrenia; although in complete remission, there is no absolute certainty that a psychotic episode without warning would not occur; there is the possibility that Breland has the condition known as Multiple Sclerosis, which might exacerbate the onset of a psychotic episode; and, there is no certainty that Breland would adhere to any monitoring program.[1] In his application for review, relator urges that the trial court's judgment is clearly contrary to the law and the evidence and is the product of an over reliance on evidence adduced at previous hearings.
We do not find that the trial court erred when it considered evidence adduced at the earlier release hearings in conjunction with the evidence adduced at the April, 1985 hearing in reaching a conclusion on the merits of relator's application. However, we conclude, with some timorousness, after careful review of the entire record, that relator has established by a preponderance of the evidence that he should be released on probation, pursuant to the provisions of La.C.Cr.P. art. 657, and the trial court erred in concluding otherwise.[2]
A brief summary of the evidence adduced at both hearings will aid in understanding our ultimate finding. At the July 21, 1980 hearing, all of the medical experts expressed the opinion that Breland suffered from a condition known as paranoid schizophrenia. Each acknowledged that Breland's paranoid schizophrenic condition was in complete remission and that such remission had been maintained without the intervention of anti-psychotic medication which was discontinued in January of 1980. In the latter connection, both Drs. Skinner and Usden testified that there was an excellent medical probability that Breland would never need medication again. Dr. Skinner testified that, although Breland had been diagnosed in the year 1977 as having Multiple Sclerosis, that diagnosis was not unequivocal. A CAT scan made in April, 1980 was normal which prompted the Doctor's conclusion that Breland's Multiple Sclerosis was either in complete remission or he never had that disease. In sum, all of the medical experts who testified in July, 1980, were of the opinion that Breland could be released without danger to himself or others, subject however to frequent continued therapeutic contact with a psychiatrist equal intellectually to Breland.[3] All testified that, if released on probation, Breland should have psychiatric sessions at least once a week, however, the optimum would be two to three times weekly. All suggested occasional monitoring by a neurological specialist for the suspected condition of Multiple Sclerosis. The other support personnel from FFF who testified at that hearing stated that Breland had become well adjusted and had not displayed any psychotic symptoms. Following this hearing, Breland was denied a discharge or release on probation.
The only medical expert to testify at the April, 1985 hearing was Dr. Jay C. Pennington, the Clinical Director and a staff psychiatrist at FFF. Dr. Pennington testified that Breland was assigned as his patient some two years before the hearing and, during such period, Breland was seen on a regular schedule. Dr. Pennington *369 stated that a review of Breland's medical records reflect that he had not been on anti-psychotic medication for a period in excess of five years and had not, during such period, displayed any signs or symptoms of psychosis or of a severe mental illness. He stated that Breland had been involved for an extended period in a "deinstitutionalization process" which he described as follows:
"This is a process in which we allow passes, first with staff members. We call these "excursion passes". And then they move from that point, if everything does right,and when I say "everything does right", we're talking about behavior outside the hospital, we're talking about no drinking, no marijuana smoking, no taking drugs and this sort of thing. Joe progressed of course from that point. Then he was allowed twelve-hour passes in East and West Feliciana Parish with his family. He had at least two (2) or three (3) of these. Things went quite well and then we started allowing longer passes, week-end passes and holiday passes. These are usually from Friday to Sunday night. And he's done quite well on these. He has always come back and submitted specimens for testing for illicit drugs, marijuana, alcohol. All these specimens have been negative.
His behavior, as described by his family, has been excellent. I have reports on every one (1) of these passes, on which the family reports he's been very cooperative, done quite well.
These passes started in 1983 and have extended to the present and he's done quite well on all of them."
Dr. Pennington concluded by stating unequivocally that, based upon his review of Breland's medical record and his personal observation of Breland over the past two years, he could be released on probation, without follow up medical attention, without danger to himself or others. Dr. Pennington did suggest that he be released on probation to his family home in Wiggins, Mississippi, as his family had been very supportive during his confinement at FFF and in the "de-institutionalization process".
Mr. G. Murray Henderson, Chief Executive Officer at FFF, testified as an expert in corrections and in the handling of forensic patients. Mr. Henderson testified that he has seen Breland on a routine basis since the latter's commitment to FFF in the year 1979. He stated that, because of his training and experience, he would readily recognize psychotic symptoms displayed by patients and that Breland had never exhibited such symptoms. He concluded that he had no qualms in recommending Breland's release on probation.
The only other witnesses to testify were Breland and his father, Glen Breland. Their testimony, for the most part, consisted of their plans for the future and the arrangements which would be made in the event of Breland's release on probation.
La.C.Cr.P. art. 657, provides the method and the conditions for release of persons committed to a mental institution after being found not guilty by reason of insanity. That article provides as follows:
"After considering the report or reports filed pursuant to Articles 655 and 656, the court may either continue the commitment or hold a contradictory hearing to determine whether the committed person can be discharged, or can be released on probation, without danger to others or to himself. At the hearing the burden shall be upon the committed person to prove that he can be discharged, or can be released on probation, without danger to others or to himself. After the hearing, and upon filing written findings of fact and conclusions of law, the court may order the committed person discharged, released on probation subject to specified conditions for a fixed or an indeterminate period, or recommitted to the state mental institution. Notice to the counsel for the committed person and the district attorney of the contradictory hearing shall be given at least thirty days prior to the hearing."
The essential element for discharge or release on probation is proof that the insanity-acquittee can be released without danger *370 to himself or others. The burden of proof lies with the committed person. All of the evidence, both lay and expert, adduced at the April 17, 1985 hearing supports the conclusion that relator can be released on probation without danger to himself or others. There is simply no evidence to the contrary. Although, as found by the trial court, Breland does have the condition known as paranoid schizophrenia, the evidence shows that that condition is and has been in total remission for over five years. The trial judge expressed fear that Breland has the condition known as Multiple Sclerosis and, if it surfaces, such might exacerbate the onset of a psychotic episode. The record reflects this to be an extremely remote possibility. Although there is no absolute certainty that a psychotic episode without warning would not occur, all of the evidence supports the conclusion that within the realm of medical probability any future psychotic episode would be gradual in onset and the sypmtoms would be recognizable by Breland and those around him. Likewise, there is no certainty that Breland will strictly adhere to a monitoring program, but there is no evidence in the record to suggest that he will not.
In sum, we conclude, based upon the record before us, that relator has borne the burden imposed upon him by La.C.Cr.P. art. 657 and should be released on probation and the trial court erred in holding otherwise. As stated in State v. Collins, 381 So.2d 449 (La.1980):
"The trial court must certainly be afforded some degree of discretion in making decisions under that statute. It cannot be read, however, to give the court unbridled power to disregard the evidence or to act arbitrarily. It would be meaningless to give a committed person an opportunity to prove that he is not dangerous if the trial court then had the absolute discretion to disregard that proof."
We do not suggest that Breland be finally discharged. In fact, relator has not applied for discharge but only release on probation and has himself suggested conditions for probation designed to assure constant monitoring of his condition. Additionally, although Dr. Pennington opined that relator could be released without follow-up treatment if, upon remand, the trial court should conclude that further treatment of relator is indicated, as suggested at the 1980 hearing, we do not wish to foreclose this as a condition of probation.
For the above and foregoing reasons, the writ granted is made peremptory and it is accordingly ordered that the trial court's order returning the relator to the Feliciana Forensic Facility at Jackson, Louisiana, is vacated. This matter is remanded to the trial court for further proceedings consistent with the views expressed in this opinion.
WRIT MADE PEREMPTORY AND MATTER REMANDED.
DOMENGEAUX, J., dissents and assigns reasons.
DOMENGEAUX, Judge, dissenting.
The majority opinion presents a respectable argument for disagreement with the district judge. Nevertheless, the peculiarities of this case persuade me to recommend an affirmation rather than a reversal.
This defendant committed a heinous crime in a bizarre fashion. His so-called exemplary conduct for the last five years or so may very well be attributed to his prowess engendered by his extremely high I.Q. of 140 or over. He is a paranoid schizophrenic. Although in remission, it is possible that a psychotic condition could re-occur, even though it is suggested that any recurrence would be gradual, and any psychotic symptoms could be recognized.
At an earlier hearing, the medical experts testified that if released, the defendant should have frequent continued psychiatric contactat least once a weekwith an optimum of two to three times a week. In an uncontrolled environment, I have grave doubts that this regimen is realistic.
Of primary significance is the opinion of the experts that defendant's therapeutic contact must be with a psychiatrist equal intellectually to Breland. This suggests to me that the defendant, with his superior *371 intelligence, is capable of out-witting his therapist. And further, what assurance can be had that such an alienist can be found under the unique circumstances of this case?
I recognize of course that the district judge does not have unbridled discretion under C.Cr.P. Art. 657. In this unusual case, however, the district judge lived with this case from its beginning and it is evident by his findings of fact and conclusion of law at this most recent hearing that he exhibited profound concern about the propriety of allowing this defendant to be released from custody.
I have great difficulty in being able to say that the district judge erred. Even though, arguendo, the evidence on the surface may favor the defendant, underlying is the real possibility of a violent act recurring which poses a grave risk to society. This surpasses, in my opinion, any right which the defendant claims to have in order to be released on probation.
Accordingly, I do not find that the district judge abused his great discretion in recommitting the defendant to the state mental institution.
I respectfully dissent.
NOTES
[1] In his application to the trial court and to this court, Breland does not seek to be discharged but only released on probation pursuant to such specific conditions as the court might impose.
[2] The trial court's reluctance in this matter is easily understood when one considers the heinous crime with which Breland was charged and his admitted bizarre mutilation of the victim's body.
[3] Breland possesses an IQ of 140 or above. All of the medical experts opined that, because of this circumstance, his therapist should be his intellectual equal.